**ARTHUR RUTENBERG HOMES, INC., and M. Pete McNabb, Inc., Plaintiffs,**

v.

**Scott MALONEY, Michael Frketic Construction Management, Inc., and Marie Bradshaw d/b/a EB's Drafting Service, Defendants.**

No. 93–856–CIV–T–23C.

United States District Court, M.D. Florida, Tampa Division.

July 3, 1995.

Frank R. Jakes, James W. Humann, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, FL, for plaintiffs.

Stefan Vaughn Stein, Dominik, Stein, Saccocio, Reese, Colitz & Van Der Wall, Tampa, FL, for defendants Maloney & Frketic Const.

Terence Matthews, Law Office of Terence Matthews, Bradenton, FL, for defendant Bradshaw.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MERRYDAY, District Judge.

This action was commenced by the plaintiffs, Arthur Rutenberg Homes, Inc., ("ARH") and M. Pete McNabb, Inc., ("McNABB") pursuant to 28 U.S.C. § 1338.

The plaintiffs assert that the defendants, Dr. Scott Maloney ("MALONEY"), Michael Frketic Construction Management, Inc., ("FRKETIC") and Marie Bradshaw d/b/a EB's Drafting Service ("BRADSHAW"), infringed copyrighted architectural drawings and works owned by ARH and licensed to McNABB. The defendants deny infringement.

This nonjury action was tried January 10–13, 1995, and final arguments occurred on February 1, 1995. The evidence featured testimony from several people involved in the pertinent events and from experts retained by each side, as well as floorplans, blueprints, drawings, photographs, and other documentary evidence.

## FINDINGS OF FACT

ARH is a franchisor of residential building companies throughout Florida. Each year ARH invests significant sums to create and develop new architectural designs. ARH uses both its internal design department and independent architects. ARH's policy is to claim promptly and to enforce consistently (indeed, doggedly) copyrights for each protected architectural design.

■ ARH provides franchisees the right to use the name "Arthur Rutenberg Homes"; a license to use and construct homes in accordance with ARH's copyrighted architectural designs; and business, financial, and warranty support. During the time pertinent to this action, McNABB was the only ARH franchisee in Manatee County authorized to use ARH's copyrighted designs.[1]

In 1991, ARH's design department developed a two-story architectural design entitled

---

1. At the close of the plaintiffs' case the defendants moved to dismiss McNABB's claims, challenging the status of M. Pete McNabb, Inc., as the ARH licensee for Manatee County. However, the parties' pretrial statement identifies "McNABB" as "M. PETE McNABB, INC.," and stipulates that "McNABB is the only entity authorized to reproduce, use and construct homes pursuant to ARH's copyrighted Jacaranda and Jacaranda II architectural drawings and works in Manatee County." Pursuant to the Court's July 19, 1994, order; Rule 3.06 (especially 3.06(e)), Local Rules of the Middle District of Florida; and Rule 16(e), Federal Rules of Civil Procedure, the further course of the trial was governed by the parties' pretrial stipulation. *See Randolph County v. Alabama Power Co.*, 784 F.2d 1067, 1072 (11th Cir.1986) ("[P]arties are bound by their [pretrial stipulation] agreement ... and may not introduce at trial issues excluded in the pretrial order."). The parties stipulated to McNABB's standing to assert claims as ARH's exclusive licensee. Even if McNABB were a nonexclusive licensee, any putative defect in McNABB's standing to sue is cured by joinder of the copyright owner as a plaintiff in this suit. *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36–37 (2d Cir.1982). The defendants' motion to dismiss McNABB's claims is **DENIED.**

"Jacaranda." In June, 1992, ARH modified the "Jacaranda" design, expanding and reconfiguring the second floor. This emended architectural design is entitled "Jacaranda II." ARH owns registered copyrights for the architectural drawings and the architectural work (i.e., the tangible embodiment of the design) for both "Jacaranda" and "Jacaranda II."

In December, 1991, MALONEY visited McNABB's model center and investigated McNABB's willingness to construct a two-story home for MALONEY on his property adjoining the Manatee River. Shortly after this initial visit, McNABB's sales representative sent MALONEY a copy of the "Jacaranda" elevation and floorplans from ARH's product manual. MALONEY found "Jacaranda" pleasing and never asked to review another design. However, MALONEY requested customizations to the "Jacaranda" design to accommodate more congenially his family's needs. McNABB frequently customizes ARH designs for customers.

Between December, 1991, and July, 1992, McNABB and MALONEY worked together to customize the "Jacaranda" design. MALONEY met occasionally with McNABB's employees, and MALONEY and his wife visited a "Jacaranda" under construction.

During the course of their negotiation, McNABB provided MALONEY numerous documents pertaining to the "Jacaranda" design, including a complete set of blueprints containing specifications for all elements of the "Jacaranda" floorplan, roof, elevations, and electrical and plumbing systems. These documents bear an ARH copyright notice. Also, McNABB entrusted to MALONEY certain modified "Jacaranda" two-line drawings, prepared by McNABB's draftsperson to include MALONEY's requested customizations. The two-line drawings of MALONEY's requested customizations were lost before trial. However, the plaintiffs established that McNABB typically inserts an ARH copyright notice on all two-line drawings. A preponderance of the credible evidence proves sufficiently that the material provided to MALONEY describing the "Jacaranda" and "Jacaranda II" designs, including all two-line drawings, bore an ARH copyright notice.

MALONEY's requested customizations to the "Jacaranda" design included adding a "front-load" garage with the capacity for three cars, relocating the fireplace from the rear wall to the side wall of the leisure room, expanding the dining room, reversing the location of the shower and water closet in the master bath, adding a bedroom and bath to the second floor, and providing access from the additional second floor bedroom to a rear porch.

During their negotiation, McNABB provided MALONEY with various price proposals. Although no construction contract resulted, the parties agree that MALONEY dealt exclusively with McNABB from December, 1991, through at least June, 1992.

In July, 1992, McNABB provided MALONEY a reduced copy of a conceptual drawing of the recently developed "Jacaranda II" design. McNABB prepared and provided another two-line drawing, this one depicting MALONEY's requested customizations to the "Jacaranda II" design. (This two-line drawing also was lost before trial.) On August 5, 1992, McNABB presented MALONEY with a final price quotation offering to construct the customized "Jacaranda II" design for $277,822.00.

Sometime during these final negotiations with McNABB, MALONEY approached FRKETIC. MALONEY admitted at trial that he showed FRKETIC a two-line drawing by McNABB of a customized "Jacaranda" (the parties contest whether the drawing was "Jacaranda" or "Jacaranda II") and asked for FRKETIC's price to build the proposed home. MALONEY told FRKETIC that the two-line drawing was an ARH drawing. FRKETIC declined to price the construction based upon a two-line drawing and insisted on construction plans, for the preparation of which FRKETIC referred MALONEY to BRADSHAW.

Although the date of the initial meeting is disputed, MALONEY met with BRADSHAW sometime after McNABB had provided MALONEY with two-line drawings showing extensive customizations to "Jacaranda."

(The first documentary evidence of BRAD-SHAW's dealings with MALONEY is an August 13, 1992, invoice from BRADSHAW to MALONEY for preliminary drawings.) At this initial meeting, MALONEY provided BRADSHAW with both an ARH brochure and the two-line drawings he had shown to FRKETIC. Again, a dispute persists whether these drawings were "Jacaranda" or "Jacaranda II." BRADSHAW testified that the McNABB two-line drawings were largely useless to her and that she discarded them quickly. Nonetheless, BRADSHAW admitted that during her initial meeting with MALONEY she reviewed (at least briefly) the ARH two-line drawings before preparing preliminary floorplan sketches for the MALONEY residence. (At all times, BRADSHAW was acutely aware of ARH's policy of persistence in claiming copyright protection for its designs and plans.)

BRADSHAW's work yielded an initial set of blueprints, finalized on September 24, 1992. At or about this time, MALONEY telephoned McNABB's sales representative and informed her that he had secured a builder at a lower price than McNABB's. McNABB's sales representative cautioned MALONEY that his home "better not look like the Jacaranda." Later, after requesting that MALONEY return the "Jacaranda" drawings, McNABB's sales representative retrieved from MALONEY's office a set of drawings, which she failed to inspect to determine whether the two-line drawings were included. (During discovery, none of the two-line drawings prepared by McNABB for MALONEY was found in the files of any party.)

After notifying McNABB that he had found a less expensive builder, MALONEY invited McNABB to submit a construction bid based on the first set of BRADSHAW plans. MALONEY presented McNABB with the first set of BRADSHAW plans on October 29, 1992. McNABB's employees immediately recognized the patent similarity between the BRADSHAW plans and the "Jacaranda" and "Jacaranda II" designs. McNABB informed MALONEY that the BRADSHAW plans infringed copyrights and that ARH and McNABB would sue if MALONEY constructed a home based on the BRADSHAW plans. Nonetheless, McNABB offered to construct for MALONEY a "Jacaranda II" with any customizations. MALONEY declined.

■ A careful and informed comparison of the "Jacaranda" and "Jacaranda II" designs over against the first set of BRADSHAW plans reveals substantial, telling, and unmistakable similarities. As BRADSHAW's expert admitted at trial, the front elevation of the BRADSHAW plan is strikingly similar to the front elevation of "Jacaranda" and "Jacaranda II."[2] The design of the BRADSHAW first floor, apart from a modified kitchen, breakfast nook, and utility room, is easily recognizable as emanating from "Jacaranda" and "Jacaranda II." The BRADSHAW second floor is revealingly similar in each component to the second floor of "Jacaranda II," although less similar (but still palpably comparable) to "Jacaranda's" second floor.[3]

---

**2.** Also, BRADSHAW's expert acknowledged remarkable likenesses between many other aspects of the contested works but concluded that the overall designs were not substantially similar. When questioned, BRADSHAW's expert failed to express a coherent definition of substantial similarity (other than exact reproduction). Whatever notion of substantial similarity BRADSHAW's expert advances, the notion departs from the regnant concept of substantial similarity incorporated into the copyright law of the United States; his testimony is discounted accordingly.

**3.** Several of the differences between the BRADSHAW plan and "Jacaranda" suggest MALONEY's customizations to "Jacaranda's" second floor, but no competent evidence establishes that

the improvements characterizing "Jacaranda II" derive from MALONEY. The law suggests that, even if ARH utilized ideas from MALONEY, the inspirational attribution of those improvements to "Jacaranda," as well as ARH's experience with the proprietary design of "Jacaranda" in the hands of other constructors and customers, entitles ARH to enjoy protection of the design embodied in "Jacaranda II." ARH is entitled to improve protected designs and protect the improvements, even those based on the experience of a design refined by the imperatives of the marketplace. "An author has the exclusive right to produce derivative works based on the original work, 17 U.S.C. § 106(2), and that right often can be more valuable than the right to the original work itself." *Atari, Inc. v. North Am. Philips*

After the October 29, 1992, meeting, during which McNABB's employees were alerted to the similarities between the BRADSHAW plans and the two "Jacaranda" designs, MALONEY requested that BRADSHAW effect certain changes in her design. Little or nothing was changed in the floorplan. Rather, as MALONEY admitted at trial, only the front elevation of the BRADSHAW plan was changed, and those changes were calculated to minimize the BRADSHAW elevation's otherwise conspicuous similarity to the "Jacaranda" and "Jacaranda II" front elevations. Those changes appear in the BRADSHAW plans as revised finally on November 25 and 30, 1992.[4]

Between late 1992 and early 1993, FRKETIC built MALONEY's home pursuant to the revised BRADSHAW drawings. After allowances, MALONEY paid FRKETIC $253,856.00 ("the final price").

Had McNABB constructed MALONEY's residence, McNABB's profit after allowances would have been 14% of the final price. ARH would have received an additional 3.5% of the final price as a franchise royalty.

The preceding paragraphs resolve the governing issues of fact. However, a further observation is warranted because, on each occasion that a court resolves conflicts in testimony and determines controlling facts, some overall explanation for a course of events is helpful. Often, no firm foothold presents itself; sometimes one does.

In this case, MALONEY admits that, after he invested valuable time and considerable energy in his exchanges with ARH and McNABB, MALONEY and his wife (an entirely credible witness when testifying to the facts) visited a "Jacaranda" model. She was, at least, strongly displeased, and she convincingly stated her reasons at trial. (Some of her reasons, such as the inability to satisfactorily observe her children from important places in the house, especially impressed the Court as candid and reasonable.) She attended an important subsequent meeting with McNABB explicitly to prevent MALONEY from consummating a contract to construct the modified "Jacaranda," an enterprise to which she objected but to which MALONEY seemed entirely agreeable. Her intervention was successful. After this meeting, the proceedings went awry.

MALONEY apparently attempted to accommodate his wife by searching elsewhere for a new design, attempted to placate ARH and McNABB by putatively considering "Jacaranda II" and by later asking McNABB (disingenuously, I conclude) to bid on his construction project, and attempted to gratify his aspiration by extracting from ARH and McNABB the value of their services at no cost to him (all of this while he simultaneously procured additional design and construction elsewhere at a cheaper rate). These tactics, although they may seem novel and clever to an amateurish infringer, are pungently familiar to both the Court and to those who advance valuable services and reveal protected intellectual property in reliance on the presumed honesty of a prospective customer. In this case, as to MALONEY, that reliance was mislaid.

MALONEY's duplicity is illustrated graphically by his refusal to enter a design agreement with McNABB (for either $2,500 or $5,000, depending on one's viewpoint) and by MALONEY's attempts to solicit from McNABB an offer to construct a home based on hijacked designs (one supposes MALONEY would have taken McNABB's offer back to FRKETIC in an effort to squeeze a few more dollars out of him). At any rate, bona fide dealings with ARH and McNABB would have proven much less costly to MA-

---

*Consumer Elec. Corp.,* 672 F.2d 607, 618 n. 12 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

4. The substantial similarities between the "Jacaranda" and the BRADSHAW designs are vividly revealed when transparencies depicting the "Jacaranda" and "Jacaranda II" floorplans are placed over either the initial BRADSHAW floorplans or the revised BRADSHAW floorplans. The transparent overlays demonstrate clearly the substantial similarity of the plans' design elements, arrangements of forms, and compositions of spatial relationships. Although the defendants introduced other floorplans that shared certain specific elements with the two "Jacarandas," even the defendants' expert was unable to identify another plan that shared as many of the two "Jacarandas'" design elements as the BRADSHAW plans.

LONEY than that which follows in this order.

### CONCLUSIONS OF LAW

■ A *prima facie* case of copyright infringement is shown when a plaintiff establishes by a preponderance of the evidence both ownership of a valid copyright in the work in question and unauthorized copying by the defendant. *Donald Frederick Evans & Assocs. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986). ARH and McNABB have shown a *prima facie* case of copyright infringement against each of the defendants.

#### A. *Ownership and Validity*

■ Under 17 U.S.C. § 410(c), ARH's Certificates of Copyright Registration constitute *prima facie* evidence that ARH owns valid copyrights to the "Jacaranda" and "Jacaranda II" plans and works. *See Continental Homes,* 785 F.2d at 903. The defendants attempt to rebut the statutory presumption of validity, principally by challenging the originality of the ARH designs.[5] The defendants' evidence is insufficient.

Original architectural works are subject to copyright protection. 17 U.S.C. §§ 102(a)(5) and (8); *see also Arthur Rutenberg Corp. v. Dawney,* 647 F.Supp. 1214, 1215 (M.D.Fla. 1986). The Copyright Act defines an architectural work as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

■ The level of originality required for copyright protection is not especially elevated. *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). The originality necessary to support a copyright for an architectural work is that originality required to protect any other work—honest and independent creation, not pristine novelty demonstrable against the balance of architectural experience. *See* 1 M. Nimmer and D. Nimmer, *Nimmer on Copyright,* §§ 2.01[A] and 2.20 (1992).

■ The underlying component parts of a creation are not subject to protection, but a creator's independent selection and arrangement of component parts into an original design is copyrightable. *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 439 (4th Cir. 1986). Although, like all modern homes, "Jacaranda" and "Jacaranda II" comprise many standard features (e.g., doors, windows, a staircase), the overall arrangement of these features, all of which provide a "look" and "feel" to a home, distinguishes "Jacaranda" and "Jacaranda II" from other homes. *See Richmond Homes Management, Inc. v. Raintree, Inc.,* 862 F.Supp. 1517, 1524 (W.D.Va.1994).

The "Jacaranda" and "Jacaranda II" designs are independent and original works, both of which are the intellectual property of ARH and both of which are entitled by force of statute to copyright protection. Their encompassing form, as well as their arrangement and composition of space and design, is protectibly different from that of every home the defendants proffered to prove a legally cognizable absence of originality.

#### B. *Copying*

■ Because evidence of direct copying rarely exists, a plaintiff in a copyright action may prove copying by evidence of access and substantial similarity. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 (11th Cir.1982). The plaintiffs have shown sufficient evidence of both access and substantial similarity to prove that the defendants copied ARH's architectural works.

---

5. The defendants also challenge the validity of the "Jacaranda II" registrations on the grounds that ARH's original registration applications failed to list the "Jacaranda" as a pre-existing work. ARH cured this defect with supplemental applications. ARH's original applications for

"Jacaranda II" registration remain valid notwithstanding the admitted omission because the omissions were neither intentional nor purposeful. "Without proof of the scienter element, the [defendants'] claim [of invalid registrations] fails." *Continental Homes,* 785 F.2d at 904.

MALONEY's extensive access to ARH and McNABB's material is undisputed. Both FRKETIC and BRADSHAW admit reviewing the two-line customized "Jacaranda" drawings prepared by McNABB. Although arguing plausibly that she never saw the "Jacaranda II" floorplan, BRADSHAW's denial is unavailing. "Access" under the Copyright Act means merely "an opportunity to view the protected material." *Robert R. Jones Assocs. v. Nino Homes*, 858 F.2d 274, 277 (6th Cir.1988). BRADSHAW had an opportunity to view the "Jacaranda II" floorplans because MALONEY possessed them before BRADSHAW prepared her plans at MALONEY's behest. Furthermore, the two-line drawings BRADSHAW reviewed contained many of the customizations to the "Jacaranda" that McNABB prepared for MALONEY and that BRADSHAW ultimately incorporated into her plans. Therefore, under the Copyright Act, the two-line drawings were a "tangible medium of expression" of the "Jacaranda" design to which BRADSHAW had access. *Accord Continental Homes*, 785 F.2d at 904 (affirming a finding of copying based on access to newspaper advertisements and sales brochures, but not blueprints). Because, among other reasons, all of the defendants admitted viewing at least the two-line "Jacaranda" drawings and had the opportunity to view the floorplans for both "Jacarandas," the plaintiffs have proven by the applicable standard of proof that the defendants gained access to ARH's copyrighted architectural works.

■ To demonstrate substantial similarity, a plaintiff need not prove mindless, slavish, or inartful copying. Rather, substantial similarity exists if, comparing the allegedly infringing work to the copyrighted work, "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks*, 684 F.2d at 829 (citations omitted); *Arthur Rutenberg Corp. v. Parrino*, 664 F.Supp. 479, 481 (M.D.Fla. 1987). (An "average lay observer" presumably is an individual who, without any vested interest in the governing issue, is sufficiently informed and alert to identify precisely the differences in the competing designs, yet sufficiently informed and independent to fairly identify and assess the similarities; that is, at a minimum, neither an engaged expert nor an oblivious passerby.) Evaluated by that standard, the copyrighted ARH designs and the MALONEY residence are substantially similar, the latter misappropriated from the former.

■ Because the plaintiffs by the applicable standard of proof have established both "access" and "substantial similarity," a presumption arises that the BRADSHAW plans were copied. The burden shifts to the defendants to rebut this presumption by persuasive evidence of independent creation. *Original Appalachian Artworks*, 684 F.2d at 829. The defendants have failed manifestly to present sufficient evidence to overcome their burden.

The primary evidence suggesting that the BRADSHAW plans were created independently and without reliance on the copyrighted ARH works is the defendants' occasionally contradictory testimony. However, as established by ARH's expert, the BRADSHAW plans are simply too similar to the ARH plans to be a product of either independent creation or coincidence. (The alleged creation in Florida by the accident of chance of a home that looks and feels like a copyrighted Rutenberg home is an episode the likelihood of which defies common sense and is, as it should be, rejected without apology. Any Florida design professional who participates in that "accident" invites suspicion if his or her story is that a copyrighted Rutenberg home is not distinctive or that a design portraying a copyrighted Rutenberg home is not to that professional at least suggestive of infringement.)

■ The defendants attempt to rebut the presumption of copying by amplifying minor differences between the MALONEY home and the protected ARH designs. However, particularized differences between a protected design and an oppugned design constitute no defense to infringement if the designs are otherwise substantially similar. "Exact reproduction or near identity is not necessary to establish infringement." *Atari, Inc. v. North Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 618 (7th Cir.), *cert. denied*, 459

U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). As Judge Doty explains, "[i]t is the presence of substantial similarities ... rather than differences which determines whether infringement exists. 'The existence of differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of [the copyrighted] work.'" *CSM Investors, Inc. v. Everest Dev., Ltd.,* 840 F.Supp. 1304, 1312 (D.Minn. 1994) (citations omitted).[6]

To the ordinary observer, a comparison of the BRADSHAW plans and the ARH plans clearly reveals the infringing similarities. "The *sine qua non* of the ordinary observer test ... is the overall similarities rather than the minute differences between the two works." *Atari,* 672 F.2d at 618. Accordingly, the defendants' preparation of the BRADSHAW plans and the consequent construction of the MALONEY residence unlawfully infringe ARH's copyrights in the "Jacaranda" and "Jacaranda II" architectural designs and works.

 MALONEY is liable as a direct infringer because of his involvement in the creation of the architectural plans and the construction of the architectural work. A defendant is liable for willful infringement if aware that his conduct constitutes copyright infringement and he nevertheless continues to infringe without a good faith belief to the contrary. *See Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829 (11th Cir.1990). Prior to construction, McNABB unequivocally notified MALONEY that the BRADSHAW plans infringed ARH's copyrighted designs. MALONEY's only response was directing BRADSHAW to cosmetically change the front elevation of her plans in an admitted effort to minimize the elevations' striking similarity. MALONEY's election to effect superficial changes in BRADSHAW's plans evidences convincingly his "attempt to disguise an intentional appropriation" of ARH's architectural work. *See*

*Atari,* 672 F.2d at 619. MALONEY is liable for willful infringement of the plaintiffs' copyrights.

 BRADSHAW is liable as a direct infringer for creating the infringing plans and for the architectural work constructed pursuant to the infringing plans. FRKETIC, as the builder of the home, is liable as a direct infringer of ARH's architectural work. The Court does not, however, find the infringement of either FRKETIC or BRADSHAW to have been willful.

The plaintiffs seek actual damages resulting from lost franchise fees and profits derived from the construction and sale of the MALONEY residence. The damages provision of the Copyright Act provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.

17 U.S.C. § 504(b).

 The proper measure of actual damages for the infringement of copyrighted architectural drawings owned by a builder and infringed by a competing builder is the lost profits suffered by the plaintiffs from the home constructed pursuant to the infringing plans. *Robert R. Jones Assocs.,* 858 F.2d at 281; *Intown Enterprises, Inc. v. Barnes,* 721 F.Supp. 1263, 1267 (N.D.Ga.1989).

Had McNABB constructed the MALONEY residence, McNABB would have realized a 14% profit on the final price. Additionally, ARH would have received a 3.5% franchise royalty on the final price. MALONEY paid $281,514.00 for the completed home. After several allowances were made, FRKETIC received the final price of $253,856.00 for the construction of the MALONEY home. Thus, the plaintiffs' damages total $44,424.80, for which the defendants are jointly and severally liable.[7] Also, the plain-

---

**6.** As the Ninth Circuit states succinctly, "[n]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Shaw v. Lindheim,* 919 F.2d 1353, 1362 (9th Cir.1990) (citations omitted).

**7.** ($253,856.00 × 0.14) + ($253,856.00 × 0.035) = $44,424.80

tiffs are entitled to prejudgment interest. *See Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036 (10th Cir.1990).

Accordingly, the Clerk promptly shall enter a judgment for the plaintiffs ARTHUR RUTENBERG HOMES, INC., and M. PETE McNABB, INC., against the defendants SCOTT MALONEY, MICHAEL FRKETIC CONSTRUCTION MANAGEMENT, INC., and MARIE BRADSHAW d/b/a EB'S DRAFTING SERVICE, jointly and severally in the sum of $44,424.80 plus prejudgment and judgment interest at a rate in accordance with 28 U.S.C. § 1961 from February 28, 1993.