**LIFETIME HOMES, INC., Plaintiff,**

v.

**WALKER HOMES, INC., Residential Development Corporation, Residential Land Acquisitions, Ameriland Investments, LLC, SGD Investments, LLC, Ronald C. Walker, a/k/a Ronald C. Walker, Jr., Claire Walker Pope and Rodney Pope, Defendants.**

**No. 2:05 CV 0479.**

United States District Court, M.D. Florida. Fort Myers Division.

April 18, 2007.

---

2. The Court reserves ruling on whether this inquiry must be pursued outside the jury's presence.

**1316**

Jon Douglas Parrish, Floyd S. Yarnell, Parrish, Lawhon & Yarnell, P.A., Naples, FL, for Lifetime Homes Inc., Plaintiff.

Amber L. Neilson, Daniel N. Brodersen, Jackson O. Brownlee, Jon Douglas Parrish, Beusse Wolter Sanks Mora & Maire, Orlando, FL, Curtright C. Truitt, Curtright C. Truitt, P.A., Ft. Myers, FL, Residential Development Corporation, Residential Land Acquisitions, Ameriland Investments, LLC, SGD Investments, LLC, Ronald C. Walker also known as Ronald C. Walker, Jr., Claire Walker Pope, Rodney Pope, for Walker Homes Inc., Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WISEMAN, Senior District Judge.

This matter was tried before the Court from March 5, 2007 through March 7, 2007 as a single count civil action for copyright infringement of an architectural work by the Plaintiff, Lifetime Homes, Inc. ("Lifetime") against Defendants Residential Development Corporation doing business as Walker Homes, Inc. ("RDC"), Ronald C. Walker, and Claire Walker Pope (collectively, "Defendants"). In short, Lifetime alleged the Defendants infringed upon its copyright in an architectural work known as the Model A by advertising, designing, constructing and participating in the construction of numerous residences under the model names "The Michael," "The Michael 2," "The Michael 3" and "The Michael 4" (collectively referenced in this opinion as "the Michael," unless otherwise indicated). Lifetime alleged that the Michael was copied or derived from Lifetime's copyrighted Model A design through one or both of two intermediary designs prepared by Al Johnson, who is not a party to this case, called the Coastland and the Concorde. Defendants denied copying or any infringement, contending that the Michael design was independently created.

At the summary judgment stage, the Court ruled as a matter of law that Lifetime was the owner of a valid copyright in the Model A and that Defendants had access to the work. The Court was also asked by the Defendants at that time to determine that the competing designs were not substantially similar. However, the Court evaluated the evidence presented on summary judgment and determined that the question of substantial similarity was a question of fact to be determined at trial after presentation of all the evidence.

This memorandum sets forth the Court's findings of fact and conclusions of law based upon the evidence presented at the trial. As discussed herein, despite the Court's finding that Defendants intentionally copied the Coastland or Concorde design in creating the Michael, the Court also finds that the Michael designs are not substantially similar to the copyrighted Model A and therefore do not infringe upon Lifetime's copyright. Consequently, judgment will be entered in favor of the Defendants.

### I. BACKGROUND FACTUAL FINDINGS

Plaintiff, Lifetime Homes, Inc., is the owner of an architectural work entitled the

"Model A" which was created in 1993 and registered in accordance with the Federal Copyright Act on September 13, 2002. (*See* Pl.'s Ex. 2.) The Model A, as described by its creator, William Nunez, is a design for an entry-level starter home that was specifically intended to minimize construction costs while maintaining a level of quality and style that would cause a buyer to select it over its competition. The Model A (like the Model T car) was designed with the production builder in mind, as it was meant to be efficient to build and quick to sell. It was intended to distinguish itself from the competition by giving what was, essentially, a smaller house the feel of a bigger one.

The Model A plan was originally designed by Nunez while with his company, Heartland Homes, Inc. At the time that Nunez drew the Model A, he intended to enter into a business relationship with a man named Al Johnson to construct homes based upon the plan. Ultimately, Johnson's and Nunez's plans to form a construction company together did not go forward. Johnson did, however, later enter into such a business relationship with Claire Walker Pope, one of the defendants in this case. Together, Johnson and Pope formed a corporation called Housing & Urban Design, Inc. ("HUD") in 1995. Each remained a fifty-percent owner of HUD until May of 2000, when Johnson sold his half of the company to Pope, making her the sole owner of the company.

In October of 1995, in connection with their new company, Johnson told Pope that he thought the Model A plan owned by Nunez would be an ideal plan for HUD to use. In connection with this recommendation, he took Pope to a house that had been constructed by Nunez and Heartland using the Model A design so that she could see the final product. During that visit, Pope and Johnson also met Nunez's then

field supervisor for construction of the Model A, Duane Hill. They later discussed hiring Hill away from Heartland to supervise construction for HUD.

After the visit, Pope agreed with Johnson's idea to use the Model A design, and Johnson contacted Nunez to obtain a license to build it. Nunez agreed to allow Johnson a non-exclusive license to use the plan within Charlotte County, Florida only.

Having received this limited permission to use the Model A, Pope and Johnson, through HUD, began to build houses based on the Model A design. During the course of their use, Johnson made some minor changes to the original Model A plans—predominantly by fleshing out details—and used different names for the modified plans, including the Coastland, the Coastland IIA, and the Concorde. It is undisputed that the Coastland and Concorde are derivative of the Model A. Pope and Johnson eventually did hire Duane Hill to work for HUD and, with his help, went on to build Model A's, as Coastlands and Concordes, from the years 1996 through 2000. During that time, they violated the terms of the license agreement with Nunez by building over 200 homes outside Charlotte County, Florida.

In 2002, Nunez discovered the unauthorized homes built by HUD. By that time he had transferred ownership of the Model A to his new company, Lifetime Homes. In 2003, through Lifetime, he filed suit in this Court alleging copyright infringement against HUD and Claire Walker Pope individually.[1] HUD and Pope settled this first infringement case on April 30, 2004 for the sum of $500,000. In 1999, three years before Lifetime brought the first infringement action against HUD and Pope and during the time that HUD was alleged to

---

1. For whatever reason, Lifetime elected not to     sue Johnson.

be infringing upon the Model A with its Coastland and Concorde models, Pope and Ronald Walker, along with Duane Hill, began to visit jobsites where HUD was building Coastlands and Concordes. Al Johnson was not included in or aware of these visits. It was during this time frame that Pope began to express dissatisfaction with the way that Johnson was handling the construction for HUD. Both Pope and Ronald Walker, who had no previous experience in construction, were studying to take the examination to be general contractors. Further, according to Ronald Walker, he and Duane Hill had begun discussing the possibility of starting a construction business together.

Pope and Walker testified that it was during this same period, some time in 1999, that they developed the design for the original Michael. Although the accounts given at trial by Pope and Walker varied from the other's version (and from the versions given during discovery), the basic story is that Walker and Duane Hill met for lunch at a local restaurant, as was their habit. Pope joined them. Hill and Walker continued discussions about going into business together. At that meeting, according to Walker, Duane Hill allegedly sketched out the general plan for the original Michael on a paper napkin or placemat. From there, the witnesses' stories differed on many details, including among other particulars: at what restaurant the meeting occurred; how long the meeting lasted; whether Claire Walker Pope was present at the meeting or participated in the conversations concerning the development of the design; how the rough sketch became a detailed architectural plan and how the plan was ultimately conveyed to the draftsman, Jim Scott; and who picked up the finished product from Jim Scott. In addition, the Defendants did not present any documentary evidence demonstrating the development of the plan. As discussed in greater detail below, the Court did not find

Pope or Walker to be credible witnesses, and, for a number of reasons, finds their story as to the creation of the Michael to be completely preposterous.

Regardless, Pope and Walker eventually took the general contractors examination together. Pope failed the test the first time she took it but Ronald Walker passed it. Together, mother and son used a shell corporation formed previously by Pope to start a new business, RDC. When RDC was formed, Claire Walker Pope was its sole director; she remained the sole director of the company through February, 2001. In her licensing submissions to the Florida Department of Business and Professional Regulation, Pope also listed herself as the President, Secretary and shareholder of the company. Ronald Walker was listed as the Vice–President and Treasurer. Pope supplied land to RDC to build Michaels and financed the construction of the first Michael model home. When she finally obtained her contractor's license in 2002, Pope also bought out Johnson and took over HUD.

In 1999, RDC built its first Michael very close to one of HUD's own Coastland/Concorde models. Johnson, who was running the construction for HUD and was still a fifty-percent owner of the company, saw the house and became very upset because he felt that Pope and Walker had effectively gone around him and entered into competition with him on his own design in the same locale. At the time, Claire Walker Pope was still Johnson's partner in HUD. Johnson confronted both Claire Walker Pope and Ronald Walker about his belief that the Michael was a copy of the Coastland/Concorde designs but was told by them that, in creating the Michael, they had changed the Coastland/Concorde design 15% and that, therefore, Johnson had no recourse. At the trial, Johnson's ac-

count of this conversation went unrebutted by either Pope or Walker.

Moreover, at trial, Lifetime presented substantial evidence, both direct and circumstantial, indicating that Defendants intentionally copied the Coastland/Concorde designs to come up with the Michael. There is no dispute that Lifetime's Model A plan was copied by Al Johnson, working for HUD, to create the Coastland/Concorde designs, with some minor changes. In support of Lifetime's contention that the Defendants subsequently copied the Coastland/Concorde designs to create the Michael, Lifetime presented plan comparisons as well as compelling evidence that there were "telltales" or "relics" from the architectural drawings for the Coastland/Concorde designs that appeared in the architectural plans for the Michael but did not explicitly appear in the original Model A plans. Some of these were minor changes and others were notations or drafting conventions that were omitted from the Model A drawings. These "carry-overs" included the identity of naming conventions for the rooms, the appearance of notations designating the location of shear walls, the substitution or elimination of certain items such as tubs and windows, the type and sizes of certain doors, the method for accessing the utility room, the location and orientation of certain amenities including the washer/dryer, air conditioner and water heater, and particular drafting notations, or call-outs, on the plan, including those for a dryer vent, roof venting, roofing materials, ceiling heights, the roof pitch and a five-shelf linen closet across from the second bathroom. All of these items explicitly appeared in both the Coastland/Concorde designs and the Michael designs but were either slightly different or not explicitly detailed in the original Model A drawings.

Lifetime, through Nunez's testimony, pointed out that these "relics" were significant in three different respects. First, they demonstrated which plan was copied from which. Second, the appearance of such detailed relics (many of which were unnecessary to a finished product) in the final Michael plans constituted direct evidence that the actual construction drawings for the Coastland/Concorde plans were copied. And third, because those relics were of such fine detail, their appearance negated the Defendants' claims that their plans were independently created from a vague sketch on a napkin or placemat. In other words, the appearance of such details showed that the actual construction plans for the Coastland/Concord were copied to create the Michael. Based on the evidence presented at trial, the Court finds as a factual matter that the Defendants copied the plans for the Coastland/Concorde to create the Michael but incorporated additional changes, as discussed below, to mask the copying and to reduce the risk of being found liable for copyright infringement.

Regardless, RDC went on to build 655 Michaels from its inception until 2006. Nunez discovered these buildings that he believed to be infringing on his design shortly before instituting the present lawsuit, while doing some market research in the areas where the Michaels were being constructed. As a result, Lifetime filed this suit alleging infringement of the Model A design for the second time, claiming that Ronald Walker and the other Defendants, by using the Coastland and Concorde designs, had also infringed the Model A.

## II. ANALYSIS AND CONCLUSIONS OF LAW

### A. Plaintiff's Prima Facie Case of Copyright Violation

■ A plaintiff must prove two elements to establish a case for copyright

infringement: (1) that he owns a valid copyright in the work at issue and (2) that the defendant copied original elements of that work. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir.2000) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)).

■■■ Copying in an infringement action may be proven by direct or indirect evidence. *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 904 (11th Cir.1986). Direct evidence is evidence that shows that all or part of a protected work was actually copied. Because direct evidence of copying is rarely available, a plaintiff may also show infringement indirectly by offering proof of two elements: (1) that the Defendant had access to the work in question; and (2) that the works are substantially similar. *Id.* If copying is proved, however, whether by direct or indirect evidence, "the plaintiff also must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its protected elements." *Leigh*, 212 F.3d at 1214. Stated otherwise: "Even in the rare case of a plaintiff with direct evidence that a defendant attempted to appropriate his original expression, there is no infringement unless the defendant succeeded to a meaningful degree." *Id.* (citing *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 122–23 (2d Cir.1994)).

In this case, the Court held on summary judgment that Lifetime was the owner of a valid copyright in the Model A home design, and that the Defendants, Walker, Pope and RDC, had access to the Model A design. Consequently, the Court will concentrate its analysis here on the issues of copying and substantial similarity. As discussed below, this is one of those "rare cases" where express copying occurred, but there is no infringement because the derivative designs are not substantially similar to the copyrighted design.

#### (1) Copying

■■■ As indicated above, Lifetime presented both direct and indirect evidence of actual copying, and the Court accepts Lifetime's witnesses' testimony, including Al Johnson's statement that the Defendants essentially admitted to copying the Coastland/Concord plans, over the Defendants' testimony. Significant details in the Defendants' accounts as to how the Michael was created were remarkably inconsistent from each other; Ron Walker simply did not have the experience to design a home of this kind; and the details in the plan allegedly produced as a result of the meeting were inconsistent with the vague sketch and too similar to the Coastland/Concord construction plans for coincidence to have played a part. Further, not one shred of documentary evidence existed as to the creation process and no evidence regarding any revision process from the sketch given to the draftsman to the production of a final plan. The credibility of both Claire Walker Pope and Ronald Walker was impugned at trial, and the Court simply cannot credit the Defendants' version of events. It is clear to the Court, in fact, that Ronald Walker, with the indirect or express complicity of Claire Walker Pope, intentionally set out to copy the Coastland or the Concorde, and that, in all likelihood, the Defendants intentionally incorporated enough differences in their design of the initial "Michael" to avoid liability for copying.

To be clear, the Court finds that the Defendants intentionally copied the Coastland and/or the Concorde designs, which themselves were adapted or derived from the Model A by Al Johnson. To the extent the Michael copied elements of the Concorde and Coastland that did not appear in the Model A design, copying of those ele-

ments themselves cannot give rise to a cause of action for copyright infringement because (1) Lifetime did not create those changes and (2) neither Lifetime nor any other party filed a copyright in the derivative Concorde and Coastland designs. Thus, if copying the Concorde or the Coastland is to provide a basis for liability, it will only be because by copying the Coastland or the Concorde, the Defendants actually copied the basic elements of the Model A itself, which were reproduced in the Coastland and Concord. *Cf. Montgomery v. Noga*, 168 F.3d 1282, 1292 (11th Cir.1999) (where the evidence at trial showed that a later, non-copyrighted derivative of the plaintiff's copyrighted design "incorporated over seventy percent of the original source code from the registered work," the defendants, by downloading and incorporating the later work as a utility on its product, "infringed [plaintiff's] registered copyright in the original work" (citations omitted)). Given that the Court finds that the Defendants intentionally copied certain elements of the Concorde and/or the Coastland, the issue that remains to be resolved is whether the Michael is substantially similar to the *Model A* by virtue of having been copied from the Coastland/Concorde.

### (2) Substantial Similarity

As the Eleventh Circuit has had occasion to observe, "[t]he term 'substantial similarity' in copyright infringement actions has not always been used with precision." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 n. 4 (11th Cir.1994). At a minimum, to show substantial similarity, a plaintiff must establish that "an average lay observer" would recognize the alleged copy as having been appropriated from the copyrighted work. *Id.* (citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982)). "An 'average lay observer' presumably is an individual who, without any vested interest in the governing issue, is sufficiently informed and alert to identify precisely the differences in competing designs, yet sufficiently informed and independent to fairly identify and assess the similarities; that is, at a minimum, neither an engaged expert nor an oblivious passerby." *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F.Supp. 1560, 1567 (M.D.Fla.1995), *quoted in John Alden Homes v. Kangas*, 142 F.Supp.2d 1338, 1344 (M.D.Fla.2001), *aff'd*, 37 Fed.Appx. 979 (11th Cir.2002).

In evaluating the question of substantial similarity, the Court must consider the similarities between the designs as well as the dissimilarities. *Howard v. Sterchi*, 974 F.2d 1272, 1274–75 (11th Cir. 1992). A court may find that floor plans are visually similar with the same type of general layout yet also find their dissimilarities significant. *Id.* at 1276. In architectural plans, "modest dissimilarities are more significant than in other types of art works." *Id.* The Court also recognizes that a list of similarities (or dissimilarities) is "inherently subjective and unreliable." *Beal*, 20 F.3d at 460. Ultimately, "[w]hether differences negate infringement depends upon whether the differences 'so outweigh similarities that the similarities can only be deemed inconsequential within the total context of the copyrighted work.'" *LaJoie v. Pavcon, Inc.*, 146 F.Supp.2d 1240, 1246 (M.D.Fla.2000) (quoting *Maloney*, 891 F.Supp. at 1568).

Prior cases from this jurisdiction have discussed at some length the degree of similarity required for a finding of "substantial similarity" between architectural designs. The Court finds particularly instructive the Eleventh Circuit's decision in *Howard v. Sterchi*, in which the plaintiff who asserted copyright infringement of the floor plans for log homes failed to establish substantial similarity between the plaintiff's and defendants' plans, de-

spite the fact that she showed actual copying, and despite the fact that the floor plans were visually similar and the layouts were generally the same. In reviewing the district court's decision, the Eleventh Circuit noted the similarities listed by the district court, including:

1. overall layout and proportions
2. two floors
3. three bedrooms, two baths
4. master bedroom on right side of first floor
5. downstairs bathroom has tub; upstairs has shower
6. kitchen in center rear
7. combined dining room and living room (parlor) on left side of first floor with fireplace at center of interior wall
8. stairs in center, facing main entry, master closet under stairs, linen closet to right of stairs on second level
9. small deck at rear entry off of kitchen
10. nearly identical placement of windows.

*Howard,* 974 F.2d at 1276. The court also listed the points of substantial dissimilarity:

1. dimensions of the rooms and the total area (1080 square feet of heated space versus 1212 square feet)
2. roof lines
3. bay window at left rear of [plaintiff's models] only
4. location of range, refrigerator, washer and dryer
5. open shelving in kitchen ( [plaintiff's models] only)
6. placement of commode and lavatory in first floor bath
7. door placement or orientation (right or left-handed opening) in first floor bath, coat closet, master bedroom and closets.

*Id.* On the basis of these dissimilarities, the Eleventh Circuit affirmed the district court's decision that the plaintiff had not shown substantial similarity between her design and the allegedly infringing design:

[A]lthough the floor plans are visually similar and the layout is generally the same, the dissimilarities are significant, particularly the roof lines, the bay window and the dimensions. ... The variety of ways a two-story rectangle can be divided into three bedrooms, two baths, a kitchen, a great room or living room, closets, porches, etc., is finite. In architectural plans of this type, modest dissimilarities are more significant than they may be in other types of art works. The district court did not err in determining that the dissimilarities between [plaintiff's models and defendants'] are significant [and that the plaintiff] failed to establish by a preponderance of the evidence the substantial similarity of the plans required to show copyright infringement.

*Id.* (internal citation omitted).

Also pertinent is the more recent case of *John Alden Homes v. Kangas,* from this district, in which United States Magistrate Judge Frazier held that both access to copyrighted drawings and, in fact, actual copying were proven, but plaintiff did not establish the necessary substantial similarity between the copyrighted and allegedly infringing designs. In that case, the plaintiff had designed and developed the "Key Largo" and "derivative Key Largo" house plans, the latter incorporating some changes requested by the plaintiff. The plaintiff then traced the Key Largo plan on yellow piece of paper and faxed the yellow paper to a third party designer, who used it to develop the "Crown" model, which was actually used in the building of the plaintiff's home. Although intentional copying had occurred, the court found that the Crown was not substantially similar either to the Key Largo or derivative Key Largo:

The Court finds that the yellow sheet of paper, the Crown and the derivative Key Largo (Pl. Exh. 9) have *the same layout in that the rooms are located in the same places*. However, as the Eleventh Circuit has noted, *there are only so many ways to place three bedroom[s], bathrooms, a laundry room, a living room, family room and kitchen.*

The Crown and the derivative Key Largo model have the same number of rooms, however the room sizes in the two plans vary. In addition, the Crown's Master bath is not similar to the Key Largo in that the Crown's Master bath juts out at the front of the house to accommodate the bath tub. Further, the family room in the Crown also has a portion of the wall that juts out of the back of the house to accommodate a built in entertainment center. The walls of the Crown's master retreat are more angled than the study in the Key Largo. The Crown's bedroom nearest the foyer also juts out of the front wall whereas in the Key Largo, the third bedroom is even with the study wall. The master closet locations are different. The outer walls around the entertainment and dining room are square in the Crown and angled in the Key Largo. There are other similarities and differences too numerous for the Court to list. *However, the Court ... finds that the Crown plans and the Kangases['] home are not substantially similar to the Key Largo model plan or any derivative of the Key Largo model.* John Alden Homes, 142 F.Supp.2d at 1345 (emphasis added).

Similarly, in the case of *LaJoie v. Pavcon, Inc.,* also from this district, the court held that the allegedly infringing design was not substantially similar to copyright-ed design. In reaching that decision, the court noted that the floor plans of the plaintiff's design and the defendant's resident were "strikingly similar," and that the designs for the latter appeared to have been traced from the designs for the former. 146 F.Supp.2d at 1247. Notwithstanding, the court found the dissimilarities to be more compelling, including that the allegedly infringing design was larger than the plaintiff's plan by over 1000 square feet, and the defendant's residence had a "European appearance with different roof lines, a different pool area and veranda, and a portico or covered area extending from the house to the cabana. In fact, the two homes, in totality, appear to be completely different residences. The Court finds that the differences in the elevations and sizes of the homes are significant, and constitute more than just superficial changes made in an attempt to disguise similarities." *Id.* at 1247–48 (internal citations and footnote omitted).

■ With respect to the plans at issue in the present case, the layout of the floor plans in the Model A and the Michael are remarkably similar insofar as the placement of the bedrooms, and the general location of the living room, dining room, kitchen, garage, and optional lanai. (*See* Pl.'s Ex. 1; Defs.' Ex. B.) Notwithstanding these similarities, there are a number of differences between the Model A as compared to the first Michael:

1. The living area of the first Michael is 1221 square feet, with a total area of 1852 square feet, while the living area of the Model A is 1147 square feet, with a total living area of 1609 square feet (or 1797 with lanai). Consequently, the dimensions of nearly all the rooms in the Michael are slightly larger than those of the Model A, although not uniformly so.[2]

**2.** For instance, the Michael's master bedroom measures 15′ by 12′, while the Model A's measures 14′ by 10′8″; the Michael's bedrooms #2 and #3 are both 11′2″ by 10′,

2. The front elevations of the two houses are different in that they have different rooflines. The original Michael has a secondary "hip roof" located over the entry, whereas in the Model A, the hip roof extending over the garage also extends over the walkway to the entry. (*See* Pl.'s Ex. 1; Defs.' Ex. B.)

3. The windows at the front of the Michael are different from the Model A's in that they are arched as opposed to square. The front living room windows on the Model A are two separate windows, whereas the Michael has one large window. In addition, the placement of windows throughout the houses varies slightly. For instance, in the Model A, Bedroom # 2 has only one window, facing forward, and that window is not centered in the bedroom wall but is close to the far right wall. Bedroom # 2 in the Michael has two windows, with the front window centered on the wall of the bedroom facing the front of the house. The Michael's master bedroom has a single window, while the Model A has one window and a smaller second window in the master bathroom.

4. While the floor plans are visually similar, the Model A's kitchen is "bumped out" two feet eight inches into the (optional) lanai area, creating a different line along the back of the house than that of the original Michael, which is one flush line. In addition, the kitchen in the Model A is a "wrap around" kitchen creating a nook with only one entrance. The kitchen in the original Michael has an island creating a free flow or double entrance into the kitchen area.

5. In the Michael, the laundry room is a walk-through laundry room from the garage to the kitchen, with the washer and dryer, as well as a laundry tub, to the right. In the Model A, there is no walk-through from the garage. The entry is across from the kitchen through folding doors. There is no laundry tub in the Model A and, more importantly, the laundry room in the Model A juts into the living room, creating a different effect at the entry to the house.

6. In the Model A, entry from the garage is into the living room. In the Michael, the garage has an entry through laundry room, as well as a door to the outside, which the Model A does not have.

7. In the Model A, the door into the master bedroom enters into a small hallway within the bedroom, where the door to the Michael's master bedroom is at the end of the hallway. The placement of the walk-in closets and the layout of the master bathrooms are substantially different. The Model A has a large walk-in closet accessed directly from the bedroom through folding doors. In the Michael, access to the walk-in closet is through the bathroom, and it is placed where the tub in the Model A's master bath is placed. In the Model A, the bath is on the outside wall with a tub and a window. In the Michael, the bath is in the interior side of the bathroom with a shower and no window.

In subsequent Michael models, the Michael 2, 3 and 4, other changes were made. For instance, the front entry of the later designs is centered rather than right next to the garage, with the arched front window placed between the garage and the front entry. The kitchen in the subsequent Michael designs was changed to be more similar to that of the Model A, though the entrance to the kitchen is across from the entrance to the utility room rather than next to the dining room,

while the Model A's are 10'6' by 10' and 10' by 10', respectively. The Michael's living room measures 18'10" by 13'8" while the

Model A's is 15'8" by 13'2". The Model A's garage is slightly larger at 20'8" by 20' where the Michael's is 19'8" by 19'.

and the Michaels incorporate a butler pantry within the kitchen. The Michael models also have a vaulted "cathedral" ceiling rather than a flat ceiling in the kitchen. The garage on the Michael 3 is to the left side of the house rather than the right— the design is basically a mirror image of the Michael 2. The Michael 4 adds a den to the front left of the house, while the rear wall of Bedroom 3 is bumped out to be even with the back edge of the lanai. In addition, a hallway with an arched entrance leads from the living/dining area to the second and third bedrooms and the second bath. The closet configuration of the two smaller bedrooms is also significantly modified.

As the Eleventh Circuit and this district have had occasion to observe, the number of ways to arrange three bedrooms, two baths, a kitchen, living room and garage is finite. Given the Eleventh Circuit's conclusion that, in the context of architectural designs, "modest dissimilarities are more significant than in other types of art works," and that a court may find that floor plans are visually similar but that the dissimilarities of the overall designs are more significant, *Howard,* 974 F.2d at 1276, this Court is constrained to conclude, reluctantly, that the number of differences between all four Michaels and the Model A outweigh the similarities to such an extent that the Michael designs cannot be deemed "substantially similar" to the Model A.

This case is distinguishable from that of *Cornerstone Home Builders, Inc. v. McAllister,* 303 F.Supp.2d 1317 (M.D.Fla.2004), in which the defendant was found liable for copyright infringement on the basis of substantial similarity despite significant differences between the original and the infringing design, including the removal of the lanai bathroom, reducing the three-door garage to a two-door space, shortening the master-bedroom wall to be even with the rear living-room wall, eliminating the front

and rear upstairs balconies, along with other changes. *Id.* at 1321. Notwithstanding these relatively substantial differences, which the plaintiff had apparently adopted to save money and reduce the overall size of the structure, the court found that the plaintiff "need not prove exact reproduction." *Id.* Of particular importance to the finding of substantial similarity was the court's conclusion that the competing homes had "the same 'look and feel'; something [defendant] could never have achieved by happenstance," and that the homes were "uncannily similar inside and out." *Id.* at 1321, 1320.

The situation here is distinguishable from that in *Cornerstone* in that the houses at issue in the case at bar are not sufficiently distinct or unique in design for an overall similarity in "look and feel" to outweigh the significant differences in the designs. Lifetime simply has not carried its burden of demonstrating that the Michael designs are substantially similar to the Model A, and its infringement claim must therefore fail.

## III. CONCLUSION

The Court finds for the Defendants in this action on the basis that the allegedly infringing designs are not "substantially similar" to the Plaintiff's original copyrighted design, such that the Defendants cannot be liable for infringement of Plaintiff's copyright. Judgment in favor of the Defendant will therefore be entered.

### *FINAL JUDGMENT*

This matter was tried before the Court in a bench trial from March 5, 2007 through March 7, 2007. As set forth in the Court's Findings of Fact and Conclusions of Law, filed and entered contemporaneously herewith, the Court finds that judgment for the Defendants in this action is appropriate on the basis that the designs

1326

that are alleged to infringe upon the Plaintiff's copyrighted design are not "substantially similar" to the Plaintiff's design, such that the Defendants cannot be liable for infringement of Plaintiff's copyright.

Accordingly, **JUDGMENT** is hereby entered in favor of the Defendant; Plaintiff's claim for copyright infringement is hereby **DISMISSED** and the case is **CLOSED**.

It is so **ORDERED**.